ROBERTS, J.,
for the Court:
¶ 1. Derek Conway was convicted of murder in the Circuit Court of Forrest County. He appealed his conviction, which was considered by this Court. After reviewing the issues presented, we ultimately affirmed Conway’s conviction. See Conway v. State, 915 So.2d 521, 527 (¶ 28) (Miss.Ct.App.2005). Conway received leave from the supreme court to file his motion for post-conviction relief (PCR) in the trial court. Conway subsequently filed a PCR motion in the Circuit Court of Forrest County in which he argued that he had received ineffective assistance of counsel at both the trial and appellate level as well as arguing other matters. Following the trial court’s denial of Conway’s PCR motion, he appeals and raises the following issues, which we have restated for the purpose of clarity and concision:
I. WHETHER CONWAY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING HIS CRIMINAL TRIAL;
II. WHETHER CONWAY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE APPEAL OF HIS CONVICTION OF MURDER;
III. WHETHER CONWAY WAS DENIED A FAIR TRIAL; and
IV. WHETHER CONWAY WAS DENIED PROCEDURAL DUE PROCESS.
Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶2. The facts surrounding Conway’s shooting of Kenneth Ray Mooney were set out in Conway as follows:
Derek Brandon Conway was a friend of Joseph Jansen. Jansen became aware that Conway and his wife, Christina, had separated. Heather Es-sary, an ex-girlfriend of Conway’s, contacted Conway and told him that Christina and Jansen were using Es-sary’s cell phone to communicate with each other. Conway called Christina and accused her of seeing Jansen, an accusation Christina denied. Conway told Christina that he would fight Jansen when Jansen returned from Alabama. Jansen called Conway and asked him why he was being accused of sleeping with Christina. Conway said nothing in reply, and the conversation was ended.
After the telephone conversation, many of Conway’s friends informed him that Jansen and Christina were sleeping together. Conway again called Jansen and accused him of sleeping with his wife. Jansen again denied the allegations. According to Jansen, they talked the situation over and Conway eventually told Jansen that he believed him.
On the afternoon of July 4, 2002, Conway and two of his friends, Michael Smith and Paul Ingram, went to Conway’s mother’s house. They ingested crystal methamphetamine and remained at Conway’s mother’s house until the evening. At approximately 8:00 p.m. Conway, Smith, and Ingram drove to Bud’s and Sud’s Car Wash to wash Smith’s car. Next to Bud’s and Sud’s is the Kangaroo store. Ingram was shopping for something to drink. As Conway and Smith were vacuuming the car, Conway saw Anthony Thames’[s] truck pull up at the Kangaroo store. Thames was driving, Kenneth Ray Mooney was in the passenger’s seat, and Jansen was in the middle.
Ingram came out of the Kangaroo store and spoke to Jansen. Ingram told Jansen that Conway and Smith were at *592 the car wash. Jansen, Thames, and Mooney drove to the car wash and stopped in front of Conway. The three of them began staring at Conway and laughing.
Conway reached in Smith’s car, took out a [Maglite] and walked over to the truck. Jansen tried to get out of the truck, but Mooney would not let him out. Conway hit Mooney in the head with the [maglight] twice.
Jansen and Thames testified that none of the occupants in the truck had a weapon. Conway testified that he attacked Mooney because he “was scared that they were all fixing to do something to him” and that “he didn’t give them a chance” for the boys in the truck to harm him. According to Conway, Mooney attempted to strike him in the head with a beer bottle. No other witnesses testified that Mooney displayed any acts of physical aggression.
After Conway hit Mooney in the head with a [Maglite], Conway and Jansen argued about whether Jansen was sleeping with Conway’s wife. Conway pulled out a gun from his back pocket and shot Mooney. Conway then ran back to Smith’s car and drove away, saying, “I didn’t mean to; I’m sorry.” Thames and Jansen took Mooney to Forrest General Hospital, where he died later that night. Conway turned himself in to the police the next day. The jury found Conway guilty of first[-]degree murder.
Conway, 915 So.2d at 523-24 (¶ ¶ 3-9).
¶ 3. Following the hand-down of Conway on November 29, 2005, and subsequent issuance of the mandate on December 20, 2005, Conway’s appellate counsel filed a motion for an enlargement of time to file a motion for reconsideration with this Court. The motion was denied by this Court. Conwajfs current counsel filed a motion for reconsideration of this Court’s denial of the motion for an enlargement of time, which was also denied. Conway subsequently filed a petition for writ of certiora-ri review with the supreme court. This motion was treated as a motion to suspend the rules by the supreme court, and it was denied.
¶ 4. Conway then filed an application in the supreme court to proceed in the trial court for post-conviction relief pursuant to Mississippi Code Annotated section 99-39-27 (Rev.2007). The supreme court granted Conways motion, and he subsequently filed a PCR motion on November 6, 2007, in the Circuit Court of Forrest County. In its brief, the State claims that the trial court summarily dismissed Conway’s motion. However, the record shows that there were two notices of hearing, setting a hearing date on November 20, 2007, and March 21, 2008, respectively, as well as a re-notice of hearing. Further, in its May 6, 2009, order nunc pro tunc denying Con-ways motion, the trial court stated that “this matter [was] previously heard by the Court on October 3, 2008....” On September 12, 2008, the State through the district attorney’s office filed an answer to Con-ways PCR motion. The answer was quite detailed and specific. Although there is no transcript of the hearing in the record, these facts suggest that a hearing on the matter did take place. Further justifying this assumption is the fact that Conway’s initial notice of appeal of the trial court’s denial of his PCR motion was filed on January 9, 2009. After reviewing Con-ways claims of error, we find that they are without merit and affirm the trial court’s denial of his PCR motion.
DISCUSSION
I. WHETHER CONWAY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING HIS CRIMINAL TRIAL.
¶ 5. Conway first argues that he was denied his Sixth Amendment right to ef *593 fective assistance of counsel. Specifically, Conway assigns the following errors of his trial counsel on appeal: (1) failed to adequately prepare for Conway’s trial; (2) failed to renew his motion to exclude evidence provided by the State; (3) failed to move for a mistrial after learning that a juror had failed to inform the court that she knew Conway’s mother; and (4) failed to object to the qualifications of the State’s expert witness.
¶ 6. The standard of review for a claim of ineffective assistance of counsel is a well-settled, two-pronged principle of law. The supreme court has stated:
In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney’s performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. Strickland v. Washington, 466 U.S. 668, 687-696, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Witcher v. State, 479 So.2d 710, 713 (Miss.1985); Stringer v. State, 454 So.2d 468, 477 (Miss.1984). [A reviewing court] looks at the totality of circumstances to determine whether counsel’s efforts were both deficient and prejudicial. Carney v. State, 525 So.2d 776, 780 (Miss.1988); Read v. State, 430 So.2d 832, 839 (Miss.1983). “Judicial scrutiny of counsel’s performance [is] highly deferential.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052. There is a strong but rebuttable presumption that counsel’s conduct falls within the wide range of reasonable professional assistance. Carney, 525 So.2d at 780; Gilliard v. State, 462 So.2d 710, 714 (Miss.1985). Only where it is reasonably probable that but for the attorney’s errors, the outcome of the trial would have been different, will we find that counsel’s performance was deficient. Dickey v. State, ,662 So.2d 1106, 1109 (Miss.1995); Reed v. State, 536 So.2d 1336, 1339 (Miss.1988).
Holly v. State, 716 So.2d 979, 989 (¶37) (Miss.1998).
¶ 7. Furthermore, the appellant bears “the burden of proving that counsel’s performance was deficient and prejudicial.” Branch v. State, 882 So.2d 36, 52 (¶ 26) (Miss.2004) (citing Hansen v. State, 649 So.2d 1256, 1258 (Miss.1994)). Additionally, there is no constitutional right to errorless counsel. Id. (citing Stack v. State, 860 So.2d 687, 696 (¶ 20) (Miss.2003)); Cabello v. State, 524 So.2d 313, 315 (Miss.1988); Mohr v. State, 584 So.2d 426, 430 (Miss.1991).
A. Whether Conway received ineffective assistance of counsel as a result of his trial counsel’s being unprepared.
¶ 8. At the beginning of Conway’s trial, his counsel moved the trial court for examination and testing of physical evidence and for a continuance. However, the motions were denied. On appeal, Conway argues that the record shows that Conway’s trial counsel was deficient in his preparations for trial and that “[t]he deficiencies prejudiced Conway’s defense because [his trial] counsel was unprepared for trial; was unable to obtain separate verification of the existence and placement of the fingerprints on the bottles found in the truck; and was unable to obtain separate verification of the accuracy of the enhanced videotape.... ”
¶ 9. Based on the record before us, and the colloquy between Conway’s attorney, the assistant district attorney, and the trial court concerning the above-mentioned motions, we find that Conway has failed to show deficient performance by his trial-counsel which prejudiced his case. The following colloquy, although lengthy, occurred during the hearing on Conway’s motions and illustrates Conway’s trial attorney’s level of preparation:
*594 MR. PRICE [Conway’s attorney]: Your Honor, on behalf of Mr. Conway, I have filed a motion for examination and testing of physical evidence and for a continuance. The reason for that, Your Hon- or, is in reviewing the discovery which is still being provided to us as of today, I have some problems still with not having some of it. In reviewing what I had as of last Friday when I filed the motion, I did not have anything pertaining to some items of evidence which were seized or taken from the pickup truck in which the victim was located at the time of the shooting. My client’s defense in this case, Your Honor — the charge is murder. It appears from the facts and circumstances that I have seen in reviewing the various witness statements that my client has possible defenses of accident. He has possible defenses of lesser[-]included defenses of manslaughter and he possibly has a defense of self-defense. And that’s because some of the witnesses and Mr. Conway, himself, put three gentlemen approaching his location. There was sort of an ongoing dispute between him and one of the gentlemen. And Mr. Conway stated in his own statement that one or more of the occupants was picking up — or had picked up a beer bottle or some type of bottle within the truck and swung that item at him in an attempt to injure him prior to the gun going off. When I saw from the discovery in the case — and, honestly, I had thought we were going to be able to possibly work this matter out on a plea, and when the State said, no, we were not going to work it out on a plea, I examined the file carefully and saw that there was no forensic testing done on bottles which were found in and near the truck[;] therefore[,] I filed the motion. And I asked in that we be allowed to examine that and ask that those objects be sent to the crime lab for examination. Mr. Saucier has provided us subsequently with documentation that Mr. Byrd at the Hattiesburg Police Department has done a fingerprint analysis of these items that I’m talking about in that there were, you know, in their parlance no fingerprints or prints of any value, which is sort of what I was asking for but not entirely. We just inquired of Mr. Saucier whether or not there were photographs taken of the prints or anything that would be subject to further examination that we could look at, and as far as photographs, his response was, no, there are no photographs. I don’t know the state of the evidence as it exist now, but we would still like to have the opportunity to have someone at the crime lab with more expertise than Mr. Byrd examine these items to determine whether or not they might be helpful in proving these items of defense that are possible for Mr. Conway. And that’s, you know, basically the basis of the motion, Your Honor.
THE COURT: Mr. Saucier.
MR. SAUCIER [Assistant District Attorney]: Your Honor, I think I need to give the Court a bit of information for clarification. Discovery was provided to counsel opposite on July 11 of this year. That’s been three months. The discovery at that particular point in time was as it is now except for the fingerprint examination. Counsel waited until one week before the trial to decide that it would be important for his defense that he have an examination made of a squeeze bottle, which is a soft plastic strawberry drink bottle, and a beer bottle. We provided that information through Mr. Byrd, who did a Super Glue test where you enhance it with gun powder. And this test showed differently from what counsel told the Court. There was no fingerprints on the beer *595 bottle. No fingerprints on the Maglite, but there was a partial palm print on the plastic squeeze bottle for whatever purpose that would be. The most important thing in this is that I have received zero discovery from counsel opposite whatsoever. No requests were made for anything until a week before trial. We have scrambled around and tried to provide that. We have tried to provide color photographs instead of black and white photographs which were not acceptable, and I agree they’re not acceptable. Now, counsel stated that I said there were no photographs of this process. I haven’t talked to counsel, but I talked to his assistant and I told him I did not know if there were any photographs because nobody had asked for them and nobody had told me. I simply got the report. It’s still boils down to this. You have three months of discovery and you wait a week before trial and all of a sudden this is deemed important. That cannot be. And it’s not going to change the defense at all. It’s not going to change the defense as to whether or not he says that somebody was coming at him with a bottle or not because, for example, the Maglite, everybody is going to agree that the defendant had the Maglite in one hand, yet, there are no fingerprints on it. So is that going to discount something? No, because the testimony is going to still to say that the defendant had the Maglite. The fingerprints are not that important for another reason and that is the events have been caught on video camera. And I will tell the Court that the video camera is one of these stop-and-still type of video cameras that doesn’t run constantly in actual time. It’s about every four seconds. To enhance this, I discovered that there was not a machine here in this area but there is a machine in Biloxi, and I’m going to have that particular exhibit sent down to Biloxi and it’s supposed to be back by five o’clock tomorrow afternoon •with an enhanced and also complete frame-by-frame depiction of the events that occurred. The unfortunate situation, and I think in this case for the defendant, is that this event was captured on videotape. This event — you can say anything you want, that he was about to hit me with a bottle, but the facts are going to remain that the three individuals that were in the truck stayed in the truck. They could have very well have had a beer bottle or beer bottles and done exactly what the defendant said. They may not even be the same beer bottles. We have no evidence that this beer bottle or this soft drink bottle was involved in this incident. The reason that they were photographed and taken into evidence is because they were at the scene of the incident.
Now, does that change his defense? Not at all. They could of all three have had a beer bottle. They could have long neck beer bottles and could have been about to hit his client but they may not be the same beer bottles but that doesn’t mean he doesn’t have that defense. And even if they are the same bottles, the question is so what. And I simply say that this is nothing but a subterfuge for a continuance. So, now, after we’ve done the test on the beer bottle, no prints on it at all, to come up and say now we need photographs of what you did, I don’t know if Jeff Byrd did that as a processor, but I will tell the Court that the only thing that came off the Maglite, the strawberry soft drink squeezy bottle, and the beer bottle was one palm print on the squeezy bottle. But that doesn’t change any defenses nor does it change the fact that maybe his client was threatened by a beer bottle. It doesn’t change a thing because *596 every single person is going to tell you that the three men in the truck, including the deceased, had just bought beer and they had just bought ice to put the beer in. So I don’t think anybody is going to deny that there were beer bottles and ice in that truck. So it gets down to the question of did anybody threaten or gesture to the defendant. And that’s just going to be a case of who the jury believes, eyewitness testimony. Fingerprints on the beer bottles are not going to prove or disprove anything because my people are going to say there was beer in that truck and there was ice in that truck.
With that, Your Honor, we have done everything that we could, but it’s becoming habit forming for us to get a week before trial and then all of a sudden, I need such and such. There have been three months where counsel could have asked for it if he felt like it was important, and, yet, we wait a week before trial. And I submit to the Court that we have done just everything possible to try to accommodate these last minute requests. And we have done it again with the fingerprints. And we’d ask the Court to allow us to go forward Monday.
THE COURT: Mr. Price.
MR. PRICE: Your Honor, I’m used to being accused of waiting until the last minute, but I’d like to point out to the Court this case occurred on July 4 of 2002. We’re sitting here today, and Mr. Saucier is admitting — he is stressing that we have a very, very important piece of evidence that’s going to tell everything, a videotape from the location. Yet, today Mr. Saucier doesn’t have that tape. I don’t have that tape. I was provided with that tape over a week ago in a totally nonviewable form. I have a tape that is being presented to me purporting to be a videotape of capturing this crime. The Hattiesburg Police Department has still not provided that to the district attorney’s office so that the district attorney could provide it to me. This tape may be wonderful. It may be great for the State. It may be great for me. I don’t know. But the point is, Judge, the Hattiesburg Police Department is who has sat around and not done anything. They did not test these items of evidence when my client gave a statement to them voluntarily back at the time of the crime and said to them, “They were trying to hit me in the head with a beer bottle.” They knew at that point in time right after the crime occurred that the beer bottle was important evidence and they didn’t do a test, Your Honor. What I’ve been provided with — and, by the way, I was in Laurel this morning. I came into my office about 12:15 and for the first time I saw this letter from Mr. Saucier that says, “The videotape quality remains the same. The courtroom equipment should improve the quality to a viewable condition.” Well, that’s just great. I get to see it just as the jury does and plan my defense. “Kindly be advised that Jeff Byrd tested the items of evidence for latent prints.” Judge[,] I had a motion filed before this Court asking that these items be sent to the Mississippi Crime Lab for examination. And now we can’t do that, Judge. I don’t know this particular method. I asked my investigator. He told me a little bit about it, but I suspect it’s a one-time deal. I want the evidence to be provided to the crime lab for further examination to see whether Mr. Byrd discovered all that could be discovered. I’m not asking, Your Hon- or, do these fingerprints belong to this guy; do they belong to that guy. It’s important to me to know if there are partial prints, what part of the bottle were they on, do they indicate some *597 thing consistent with a person holding the bottle in the normal fashion to drink or do they indicate, for example, someone turning the bottle around in a normal fashion to hit somebody over the head with. That’s what’s important about this evidence not whether there are latent prints of value for identification purposes.
You know, I would further point out just for the benefit of this record for my client in this particular case, that I am a part-time public defender, that I have worked for the first six months of this year with a case load of 200 cases that I have bent over backwards to try to accommodate the State and the Court in every case possible by doing everything I could. I’ve tried to be at the beck and call of this Court. We have three judges. We have five district attorneys and assistant district attorneys, and I have held up the best I could against every one of them, Your Honor. I cannot be expected to perform — I have no staff. I have a part-time secretary that works, perhaps, three hours a day. My investigator is helpful to me but, as I said, our case load has gone from about sixty to seventy to two hundred cases. I just finished very recently another murder trial which was done on change of venue which took me eight days to try with a break for Sunday. It took me two weeks to prepare for that. I have a private practice. I have to maintain that private practice. I have lost money all year long trying to appease the former district attorney’s office. And I’ve tried to work with this D.A.’s office, and we do work well together. But I resent the implication and I want the supreme court or the court of appeals reviewing this to understand that Mr. Conway has not had the benefit of counsel that’s been able to devote a whole lot of attention to his case up until it became apparent that the State intended to carry this case to trial. You know, I would expect, Your Honor, that simply based on the videotape, which apparently I’m not going to get to see in a viewable condition until trial or, perhaps, later this afternoon, you know, is evidence enough. I think I’m entitled to have the crime lab examine this. I think my client is entitled to have a fair trial. He’s on trial for his life. It’s a very serious crime. And, you know, the fact that the Hattiesburg Police Dependent didn’t do their job is not my fault certainly, and it’s not Mr. Saucier’s fault.
This Court is well aware — and I can provide the Court with documentation and I’d like the opportunity to do so to supplement this record — that I have had numerous cases that have resulted in mistrials or not going to trial and getting continuances because of the failure of the Hattiesburg Police Department to properly do testing on evidence and provide that in a timely manner to counsel before trial.
THE COURT: Mr. Price, we’ve all been busy. And I think much of what you just said is simply for self-serving purposes. This case was set on June 24 and is scheduled to go to trial on Monday. The items you’re asking to examine, you haven’t demonstrated to me any importance for these items; however, it’s my understanding this matter is on videotape and it will be in a viewable posture — tomorrow afternoon or this afternoon?
MR. SAUCIER: Your Honor, there is a little misstatement. It’s actually viewable now. And I invited Tommy to come over and watch it at the Hattiesburg PD. But what you have to do is you have to manually do it frame by frame. And what I want to be able to do is have them a good copy where they can just *598 stick it in there and go. So it’s not been that they haven’t been given an opportunity to see it. Its just the way the mechanism is set up. They’re going to get a copy by tomorrow afternoon at 5:00 which they’re not going to have to manually do anything to. They can just stick it in and watch it.
THE COURT: If there is anything contained in that video that you think you need to renew this motion, I’ll hear that Friday morning. But, other than that, I’m going to deny your motion.
MR. PRICE: Yes, Your Honor.
¶ 10. It is clear that although Conway’s trial attorney stated that he had not “been able to devote a whole lot of attention to his case up until it became apparent that the State intended to carry this case to trial,” he did not proclaim that he was totally unprepared to go to trial. In fact, the argument during the colloquy indicates otherwise. Conway’s trial attorney stated that he had reviewed the evidence against Conway and developed various defenses to the State’s charge of murder. While it could be argued that waiting such a short period of time before trial to move the trial court for a continuance or to further examine evidence is not preferred, it is apparent that Conway suffered no prejudice as a result. The trial court stated that the motions were being denied not because of their timing, but because the trial court had not been convinced of a sufficient legal justification for granting them. Furthermore, in his direct appeal from his murder conviction, Conway argued that the trial court erred in denying both motions. Conway, 915 So.2d at 523 (¶ 1). Finding no merit to either issue, this Court stated the trial court did not abuse its discretion in denying the motion to further examine and test the physical evidence. Id. at 525 (¶ 13). Additionally, in regard to Conway’s motion for a continuance, we did not speak to whether the trial court abused its discretion, but nonetheless affirmed as “Conway offerfed] no proof that his attorney at trial was unprepared or that [Conway] was prejudiced from his attorney’s [alleged] lack of preparation.” Id. at 525 (¶ 15). We again find that Conway has failed to show prejudice from his trial counsel’s alleged lack of preparation. Accordingly, this issue lacks merit.
B. Whether Conway received ineffective assistance of counsel as a result of his trial counsel’s failing to renew his motion to exclude evidence provided by the State.
¶ 11. As quoted above, at the conclusion of the hearing the trial court stated, “[i]f there is anything contained in that video that you think you need to renew this motion, I’ll hear that Friday morning. But, other than that, I’m going to deny your motion.” Conway argues that because this Court found the admission of the videotape to be error, the fact that his trial counsel did not renew his motion for a continuance after viewing the videotape amounts to ineffective assistance of counsel.[1] We cannot agree.
¶ 12. While it is true that in Conway we found the admission of the videotape to be error, we concluded that given the overwhelming weight of the evidence against Conway, the error of admitting the videotape was harmless. Conway, 915 So.2d at 526 (¶ 20). Therefore, even if Conway could show that his trial counsel was deficient in failing to renew his motion for a continuance, a conclusion the record does *599 not support, Conway cannot show that he suffered any prejudice as a result as the admission of the videotape was harmless error.
¶ 13. Furthermore, this Court’s finding in Conway that admission of the videotape was error was not based upon any substantive flaw in the videotape itself that could have been objected to prior to the videotape’s admission into evidence, but upon a violation of Mississippi Rule of Evidence 901 when authentication of the videotape was attempted. Id. at (¶ 19). Conway’s trial counsel did, in fact, object to the admission of the videotape for this precise reason. Therefore, as Conway cannot show that his trial counsel’s failure to renew his motion for a continuance satisfies either prong of Strickland, this issue is without merit.
C. Whether Conway received ineffective assistance of counsel as a result of his trial counsel’s failing to move for a mistrial after learning that a juror failed to inform the court that she knew Conway’s mother.
¶ 14. Cleta Zeller was seated as a juror in Conway’s trial. During voir dire, all potential jurors were asked if they knew any of the individuals expected to be called as witnesses during Conway’s trial. One such potential witness was Deborah Sumrall, who is Conway’s mother.[2] Although Zeller responded that she knew a different potential witness, she did not indicate that she knew Sumrall. In an affidavit attached to Conway’s brief, Sumrall stated that she has known Zeller for years and that the two women were co-workers. Sumrall stated that she saw Zeller in the courthouse during the trial, but she did not realize Zeller was a juror until Conway’s sentencing hearing. She claimed to have sent a letter to the trial court judge about Zeller being on the jury, but she states that she never received a response from the trial court judge. Conway argues that Sumrall’s affidavit proves that she told Conway’s trial counsel that Zeller knew Sumrall, but Zeller failed to disclose that fact during voir dire. Conway argues that his trial counsel’s failure to object to Zel-ler’s silence was ineffective assistance of counsel.
¶ 15. Despite Conway’s argument that SumraH’s affidavit proves that his trial counsel had knowledge of Zeller’s alleged relationship with Sumrall as an acquaintance, Sumrall’s affidavit simply does not indicate that she told Conway’s trial counsel that she knew Zeller. Conway’s trial counsel’s failure to object to a relationship that was not disclosed and was not brought to his attention can hardly be called deficient performance. Therefore, as Conway cannot pass the threshold inquiry of Strickland, this issue is without merit.
D. Whether Conway received ineffective assistance of counsel as a result of his trial counsel’s failing to object to the qualifications of the State’s expert witness.
¶ 16. Conway’s last allegation of his trial counsel’s ineffective assistance centers around the State’s expert witness, Dr. Stephen Hayne. Dr. Hayne performed the autopsy on the body of the victim. He testified as to the trajectory of the bullet that killed the victim and the possible position of the shooter and victim at the time of the shooting. Conway argues that based upon the supreme court’s discussion of Dr. Hayne in Edmonds v. State, 955 So.2d 787 (Miss.2007), Conway’s trial counsel’s failure to object to Dr. *600 Hayne’s proffer as an expert, and also object to his subsequent testimony regarding the posture of the victim, was ineffective assistance of counsel.[3]
¶ 17. In Edmonds, the supreme court found that the trial court erroneously allowed the testimony of Dr. Hayne as it was based on opinion rather than scientific methods and procedures. Edmonds, 955 So.2d at 792 (¶ 8). Further, the Edmonds court stated that this state’s standards regarding expert testimony required that the State make a proffer of the “scientific testing performed to support Dr. Hayne’s” theory in Edmonds. Id. The supreme court ultimately found that Dr. Hayne’s testimony (and lack of proof of testing to support it) affected Tyler Edmonds’s substantial rights and that this “error was magnified when Dr. Hayne’s testimony was the only evidence — other than [Ed-mondsj’s contested confession — to support the State’s theory of the case.” Id. at (¶ 9). However, the Edmonds court nonetheless found that “Dr. Hayne is qualified to proffer expert opinions in forensic pathology.” Id. at (¶ 8).
¶ 18. In the present case, Dr. Hayne testified that Mooney was shot in the “mid-upper chest wall at a point 14 inches below the top of the head, 1-1/2 inches to the right. The bullet traveled in three dimensions going from left to right, going from the top toward the bottom, and also traveling from front to back.” Furthermore, it was Dr. Hayne’s opinion that if the shooter was within ten feet of Mooney and on level ground, the approximate location of the weapon would have been seven to eight feet off the ground. When asked by the State if Mooney’s gunshot wound would be more consistent with a “smaller person” shooting “an individual ... seated in a Toyota Tundra pickup truck,” Dr. Hayne then stated that that scenario was more probable. However, on cross-examination, Dr. Hayne testified that the trajectory of the bullet that killed Mooney was also possible if you have one five-feet-eight-inch-tall person standing within close proximity to another five-feet-eight-inch-tall person.[4] He stated: “Very simply. If the decedent rotates slightly toward the shooter, you’d have a bullet going in. When we look at him in a recumbent position, we have the bullet going down.”
¶ 19. As to Conway’s trial counsel’s allegedly deficient inaction in failing to object to Dr. Hayne’s expert status, Conway offers this Court nothing in the way of evidence or other support, save for a citation to Edmonds, showing that an objection would have been justified, let alone successful. Indeed, the Edmonds court stated that Dr. Hayne was an expert in forensic pathology. That is not to say that once an individual has been deemed an expert in one courtroom he is always an expert, but, as mentioned, we have been shown nothing to indicate that Conway’s trial counsel’s decision not to object during Dr. Hayne’s voir dire was nothing more than trial strategy. Generally, the decision to make certain objections falls -within the realm of trial strategy and is not grounds for a claim of ineffective assistance of counsel. Spicer v. State, 973 So.2d 184, 203 (¶ 69) (Miss.2007). Following the State’s voir dire of Dr. Hayne, we can hardly fault Conway’s trial counsel for choosing not to further question Dr. Hayne as to his extensive qualifications. *601 Therefore, we cannot find that Conway’s trial counsel was deficient in failing to object to Dr. Hayne’s expert status.
¶ 20. Conway also argues that his trial counsel was deficient in failing to object to Dr. Hayne’s testimony regarding Mooney’s position at the time of the shooting. However, the record is clear that when the State began to illicit testimony from Dr. Hayne concerning the positions of Mooney and Conway at the time of the shooting, Conway’s trial counsel did voice an objection. Conway’s trial counsel stated:
Your Honor, I’m going to object to the relevance of this unless there’s some determination made that the relationship of Dr. Hayne and [the prosecutor] is what it was in this case. And I think it’s very obvious to me that it’s not. So unless they can lay the proper foundation, I would object....
However, the trial court ultimately overruled the objection. We cannot say that Conway’s trial counsel was deficient in failing to make an objection that was, in fact, voiced and argued to the trial court.
¶ 21. Assuming arguendo that Conway’s trial counsel was deficient as argued by Conway, he still cannot show the requisite prejudice. Although the Edmonds court found that allowing Dr. Hayne’s testimony was error which infringed upon Edmonds’s substantial rights, the facts and circumstances surrounding Dr. Hayne’s testimony in the instant case are markedly different. In Edmonds, Dr. Hayne stated that he could not exclude the defense’s theory of the case, but he favored the State’s theory as it was more consistent with the victim’s injuries. Edmonds, 955 So.2d at 791 (¶ 7). In the present case, Dr. Hayne stated that it was more probable that Mooney was shot while sitting in a truck rather than standing straight up and facing the shooter. However, during cross-examination, he also stated, without showing favor to either theory, that the trajectory of the bullet that struck Mooney could have occurred if Mooney had rotated toward the shooter while they were both standing. Furthermore, unlike in Edmonds where “Dr. Hayne’s testimony was the only evidence — other than [Edmondsj’s contested confession — to support the State’s theory of the case,” in the instant case, there was substantial testimony from several eyewitnesses as to their recollection of the events that led to the shooting of Mooney. As such, we cannot say that Conway’s trial counsel was deficient in regard to his actions pertaining to Dr. Hayne’s voir dire or testimony, let alone that Conway suffered any prejudice. This issue is without merit.
II. WHETHER CONWAY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE APPEAL OF HIS CONVICTION OF MURDER.
¶ 22. Conway’s counsel during his direct appeal was different from his trial counsel. Following this Court’s hand-down of our decision in Conway’s direct appeal, Conway’s appellate counsel chose not to file a motion for rehearing.[5] Motions were filed by Conway’s current attorney requesting an enlargement of time to file for rehearing and reconsideration; *602 however, they were denied. Additionally, a petition for writ of certiorari was filed, but it too was denied. Conway argues that his appellate counsel’s failure to file post-appeal motions amounts to ineffective assistance of counsel.
¶ 23. Conway argues that there were two errors committed by this Court in Conway that, if argued on a motion for rehearing, would have resulted in a different outcome. First, Conway claims that .this Court “did not follow the law when examining the harmlessness of [allowing the surveillance video into evidence.]” He further claims that “[w]hile the [Court of Appeals] correctly recited the test for harmless error, the opinion does not even address the prejudice done to the defendant by the enhanced videotape’s admission into evidence.” Additionally, Conway cites Rule 103(a) of the Mississippi Rules of Evidence as support for the statement that “[t]he Mississippi Rules of Evidence indicate the harmless-error test must include an examination of the effect the evidence had on the substantial rights of the defendant.” We cannot agree to either proposition.
¶ 24. In resolving the issue of whether admission of the videotape was reversible error, we stated:
“No trial is free of error; however, to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced.” Busick v. St. John, 856 So.2d 304, 308 (¶ 9) (Miss.2003) (citing Davis v. Singing River Elec. Power Ass’n, 501 So.2d 1128, 1131 (Miss.1987); Parmes v. Illinois Cent. Gulf R.R., 440 So.2d 261, 268 (Miss.1983)). When the weight of the evidence against the defendant is overwhelming, such error is harmless. Moss v. State, 727 So.2d 720, 725-26 (¶ 24) (Miss.Ct.App.1998). Based on this Court’s review of the record and the evidence against Conway, we find that the evidence against Conway is overwhelming.
Conway, 915 So.2d at 526 (¶ 20). Further, we specifically examined the evidence against Conway in the following issue concerning whether the jury’s verdict was contrary to the weight of the evidence. Id. at 526-27 (¶¶ 21-22). In finding that the evidence against Conway was overwhelming, we implicitly found that any prejudice he may have suffered as a result of the admission of the videotape was not worthy of reversal of his conviction. An on-the-record recitation of such prejudice was simply not required. See generally, Genry v. State, 735 So.2d 186, 198 (¶58) (Miss.1999) (finding an erroneous admission of evidence harmless error given the overwhelming weight of the evidence against the defendant); Carter v. State, 722 So.2d 1258, 1262 (¶14) (Miss.1998); Sims v. State, 928 So.2d 984, 990-91 (¶ ¶ 33-34) (Miss.Ct.App.2006); Harper v. State, 887 So.2d 817, 829 (¶ 57) (Miss.Ct.App.2004).
¶ 25. Conway’s second point of error, which he argues would have justified a motion for rehearing, stems from this Court’s finding that the trial court’s denial of Conway’s motion to examine and test the physical evidence was not error. Conway argues that part of this Court’s basis for finding no error in the denial of his motion was due to the evidence contained on the videotape. Conway continues that our finding that the admission of the videotape was error, albeit harmless error, calls into question the validity of our finding that the denial of his motion to examine and test the physical evidence was not error.
¶ 26. In Conway, we reviewed the bases argued by the prosecutor in support of the State’s position that the motion should be denied. Conway, 915 So.2d at 524-25 *603 (¶ ¶ 10-11). These included: (1) that the presence of fingerprints on the bottle and Maglite were irrelevant to the issue of self-defense because of the other testimonial evidence and (2) that the presence of fingerprints on the bottle and Maglite were irrelevant because the event was captured on the videotape. Id. In resolving the issue, we stated:
The circuit court has considerable discretion in matters pertaining to discovery, and its exercise of discretion will be set aside only if there is an abuse of discretion. Gray v. State, 799 So.2d 53, 60 (¶ 26) (Miss.2001). The circuit court judge agreed with the prosecutor that the presence of fingerprints on the beer bottle and [Maglite] were irrelevant as to whether Conway acted in self-defense. Only relevant evidence is admissible. M.R.E. 401. The question of whether evidence is relevant is within the discretion of the trial judge. Federal Land Bank of Jackson v. Wolfe, 560 So.2d 137, 140 (Miss.1989). The circuit court judge did not abuse his discretion in denying Conway’s motion for discovery.
Id. at 525 (¶ 13). Our identification of the admission of the videotape as error notwithstanding, the trial court had another legitimate basis for exercising its discretion to deny the motion, to-wit, that the presence of fingerprints on the items was irrelevant given the eyewitness testimony expected. Thus, it is clear that while the admission of the videotape may have influenced the trial court’s decision to deny Conway’s motion to examine and test the physical evidence, it was not the only reason cited in its denial. This Court, again, cannot say that denying Conway’s motion was an abuse of discretion. Therefore, as Conway has failed to show that there was an arguable basis upon which to file a motion for rehearing, he can neither demonstrate that his appellate counsel was deficient, nor that he suffered any prejudice as a result. As such, this issue is without merit.
III. WHETHER CONWAY WAS DENIED A FAIR TRIAL.
¶ 27. Conway argues that he was denied a fair trial as a result of witness and juror misconduct. First, he claims that after the affirmance of his conviction in Conway, he discovered that some witnesses did not abide by Rule 615 of the Mississippi Rules of Evidence. Second, Conway argues that Zeller’s failure to respond during voir dire that she knew Conway’s mother was juror misconduct that denied him his right to a fair trial. We find that neither issue raised by Conway has merit.
¶28. As evidence of the alleged witness misconduct, Conway attached affidavits from four individuals to his appellate brief. The affidavits generally state that the witnesses for both sides were able to, and did, converse with each other during the trial. However, what is lacking from the affidavits is any mention of what was discussed, if it pertained to Conway’s trial, or any indication, other than Conway’s unsupported claim of prejudice, that there was any possibility that what the witnesses discussed affected the outcome of Conway’s trial, or they had anything to do with it whatsoever. “A technical violation of the rule is harmless where the violation did not adversely affect the defendant.” Conley v. State, 790 So.2d 773, 789 (¶ 55) (Miss.2001). Assuming arguen-do that the affidavits are accurate, Conway has failed to show such an adverse affect.
¶29. Conway next argues that Sumrall’s statement in her affidavit that she and Zeller were acquaintances for several years prior to Conway’s trial proves that Zeller was not forthright during voir *604 dire, which denied Conway of his right to a fair and impartial jury and a fair trial. Sumrall’s affidavit stated:
I have known Cleta Zeller for years and have worked with her at Mississippi Auction. Since that time I have had contact with her when I called Mississippi Auction for business reasons. I spoke to Cleta in the hallway during the trial. I did not realize she was on the jury. I was in the witness room and did not see the jury.
I feel Cleta Zeller should have been excused from the jury since it was my son who was on trial.
I realized she was on the jury when I was taken into the courtroom for the sentencing of Derek Conway, my son. I sent a letter or fax to Judge Helfrich and told him about this. I never received a response.
As stated above, when Zeller was asked during voir dire if she knew any of the potential witnesses, which included Sum-rall, she did not admit to knowing Sumrall.
¶ 30. The Mississippi Supreme Court held in Odom v. State, 355 So.2d 1381, 1383 (Miss.1978), that when a potential juror in a criminal case does not respond to a relevant, direct, and unambiguous question during voir dire, although the requested information is known to the juror, it must be determined whether the question asked of “the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited.” If these initial inquires are answered in the affirmative, then “the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror’s failure to respond.” Id.
¶ 31. In this case, after naming the potential witnesses in Conway’s trial, including Sumrall, the trial court asked the jurors if they were “related by blood or marriage to any of the potential witnesses in this case? Do any of you know the potential witnesses in this case?” Zeller responded that she was a casual acquaintance of a different potential witness, but she could remain fair and impartial to both sides. Zeller did not identify any other potential witnesses she knew. It is clear that the question asked of Zeller was relevant and unambiguous, and assuming Sumrall’s affidavit is accurate, it can be assumed that the third inquiry was satisfied. That leads us to ask whether prejudice could be inferred from Zeller’s failure to respond. Though no transcript of a hearing before the trial court concerning Conway’s motion for post-conviction relief is in the record, it is clear from the record that a hearing was held on October 3, 2005. Given the trial court’s denial of Conway’s motion, it can be reasonably assumed that no prejudice was found as a result of Zeller’s failure to mention that she knew Sumrall. Nevertheless, each case involving the voir dire of prospective jurors must be decided on an ad hoc basis considering the facts then before the court, and a trial court’s judgment in this matter will not be disturbed unless it is clearly wrong. Id.
¶ 32. We can find no reasonable basis of prejudice as Conway argues to this Court. As we found in Conway’s direct appeal of his conviction, there was a vast amount of evidence supporting Conway’s guilt. Additionally, in her affidavit, Sumrall does not suggest that: she was at odds with Zeller; there was an animosity between the two women; or Zeller was negatively biased toward Conway. One would initially assume that a potential juror who knows, is acquainted with, or is a friend and past coworker of the accused’s mother would fa *605 vor the accused as a trial juror. We can think of worse individuals to have on a jury than acquaintances with no identified malice toward the defendant. We cannot say that Zeller’s alleged failure to identify her familiarity with Sumrall, and subsequent selection as a juror, prejudiced Conway. This issue is without merit.
IV. WHETHER CONWAY WAS DENIED PROCEDURAL DUE PROCESS.
¶ 33. In his final point of error, Conway claims that the supreme court erred by “denying his Petition for Writ of Certiora-ri” as he was denied “his procedural due[-]process rights under federal and state law.” However, Rule 17(a) of the Mississippi Rules of Appellate Procedure states, in pertinent part, that “[rjeview on writ of certiorari is not a matter of right, but a matter of judicial discretion.” There simply is no right to review on a writ of certiorari. This issue is without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. Additionally, although Conway argues that his trial counsel’s failure to renew his objection was not effective assistance, other than an argument under the broad statement that the videotape prejudiced him, Conway does not specify what his trial counsel could have based his renewed objection on.

. It appears that Sumrall’s last name has changed to Bishop since Conway’s trial. However, for the sake of consistency we will continue to refer to Conway’s mother as Sum-rall.

. Conway actually calls attention to Justice Diaz’s separate opinion in which Justice Diaz casts doubt on the Edmonds majority's characterization of Dr. Hayne as an expert, as well as Dr. Hayne’s overall qualifications.

. Both Conway and Mooney were five feet eight inches tall.

. Conway’s brief contains a letter dated December 29, 2005, from the Forrest County Public Defender's office informing Conway that his conviction and sentence had been affirmed, and no basis could be found upon which to file a motion for rehearing. The letter incorrectly states the date of this Court’s hand-down of Conway as December 13, 2005. This date was actually the deadline for filing a motion for rehearing of Conway’s appeal. Additionally, the letter incorrectly informed Conway that he had fourteen days from the date of the letter to file a motion for rehearing.